|   |   |
|---|---|
| | HONORABLE RONALD B. LEIGHTON |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR11-5488RBL |
| Plaintiff, | ORDER |
| v. | |
| GALEN N. KIRKWOOD, | |
| Defendant. | |

THIS MATTER comes before the Court on Defendant's Motion to Suppress Evidence [Dkt. #99]. The Court has reviewed the materials for and against the motion. The Court has conducted a hearing with witnesses and argument of counsel. Based upon the evidence submitted on both sides of this issue, the Court **DENIES** the Defendant's Motion to Suppress Evidence.

This case resulted from an investigation into the cultivation and distribution of psilocybin mushrooms, a Schedule I controlled substance. As described in the affidavit submitted to Magistrate Judge James Donohue, the investigation developed evidence that the Defendant Galen Kirkwood was operating a mushroom cultivation operation and was dealing with Michael Maki, the apparent leader of a group of mushroom distributors.

1       Agents originally presented to the Magistrate Judge a master affidavit that supported applications for a search warrant at multiple locations. The Magistrate Judge issued all of the requested search warrants except for the warrant requested for the Defendant Kirkwood's property. The agents, after consulting with government counsel, then undertook to develop more evidence to support the issuance of a warrant, including a carefully-planned nighttime foray onto the defendant's property to make surreptitious observations of the buildings in a clearing on the property. The agents planned to, and in fact did, make their observations from the edge of the forest surrounding the clearing. The observations of the building and other items of the property, including observations consistent with a mushroom cultivation site, were included in a revised affidavit. The Magistrate Judge ultimately issued the requested warrant only after the affiant added (1) the new information about the nighttime observations, and (2) new information detailing the discovery of three other cultivation sites as a result of the three search warrants that the Magistrate Judge had issued earlier based on the master affidavit.

      In an attempt to bolster the factual predicate for the search warrant of Kirkwood's property, the agents entered the defendant's rural property through a circuitous route. In planning this trip, there were limits imposed as to how far the agents could encroach onto the property so as not to invade what could arguably and conservatively be considered curtilage. The agents were careful never to enter what could be considered curtilage and made only those observations that could be made from the edge of the woods surrounding the clearing containing the defendant's residence and the two-story building.

      The affidavit described the property as two adjoining parcels of 3.48 and 9.40 "heavily wooded" acres with a manufactured home and a pole barn in "close proximity" to each other. The affidavit further described that "agents planned a nighttime surveillance operation to obtain

more information about the Kirkwood property. Agents planned to approach the site containing the buildings on the Kirkwood property by traveling on foot through the rough woods and then observing the building site from the edge of the clearing." The affidavit then described that the agents in fact "hiked through a property west of the Kirkwood property through a forested area to the edge of a clearing on the Kirkwood property approximately 50 feet from the southwest side of a large metal two-story structure." It is clear from this description that the agents were on the Kirkwood property when they made their observations. They were "on the Kirkwood property" only 50 feet from the side of the large structure on a parcel of more than 12 acres. The agents planned to, and in fact did, enter the Kirkwood property and the affidavit did not conceal that fact.

From the vantage point at the edge of the woods, the agents could hear ventilation equipment operating inside the barn. They observed the three ventilation points in the back wall of the barn.

Remaining in the woods they circled around the house and the barn to another clearing to the north of the structures. They observed a manure pile, a greenhouse in the early stages of construction, and empty boxes that had contained ventilation equipment, air conditioner with filtration, and bleach. These are some of the ingredients and the tools used in growing mushrooms.

Both sides concede that the definition of the curtilage on this property is outcome determinative. The Fourth Amendment protects the curtilage of a home, and the extent of the curtilage is determined by whether the individual may reasonably expect that the area in question should be treated as the home itself. *United States v. Soliz*, 129 F.3d 499, 502 (9th Cir. 1997)

(fenced area around house not curtilage where gate had fallen down, no "no trespassing" signs were in place, and the fence surrounding the house was a chain link fence).

There is no bright line test for identifying the curtilage. It is a factually intense determination. There are guideposts established for the journey. Briefly put, it is necessary to distinguish "open fields" or "wilderness" from the mansion-house and the area "to which the activity of the home life extends." *United States v. Dunn*, 480 U.S. 294, 302 (1987). The four-part test requires the Court to examine: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the residents to protect the area from observation by people passing by. *Dunn*, 480 U.S. at 301.

**A. Proximity**

Generally, "there is not any fixed distance at which curtilage ends." *United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir. 1993). It must be determined on a case-by-case basis. The Second and Third Circuits have noted the importance of considering whether the area in question is in a rural, urban or suburban setting. *See, United States v. Riley*, 76 F.3d 1271, 1277, *on rehearing*, 91 F.3d 331, (2nd Cir. 1996). These courts have reasoned that the curtilage of a home in a rural area could extend farther than the curtilage of a home in an urban or suburban setting. The realities of rural country life dictate that distances between out buildings will be greater than on urban or suburban properties and yet still encompass activities intimately associated with the home; this is the nature of the "farmstead." *See, United States v. Furrow*, 229 F.3d 805, 817 (9th Cir. 2000).

**B. Enclosure**

The second factor analyzes whether the area is included within enclosures surrounding the home. "For most homes, the boundaries of the curtilage will be clearly marked; and the

conception defining curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience." *Dunn*, 480 U.S. at 302. In rural pieces of property, as here, natural boundaries such as thick trees or shrubberies may also indicate an area "to which the activity of home life extends." *Dunn*, 480 U.S. at 302.

The government accepts a conservative, common sense analysis of these first two factors. There were no fences around the home or the outbuildings. There were clearly demarked clearings that they were careful to not encroach. The clearing was suitable for the activities that are intimately associated with the home (i.e., washing equipment, building structures, parking vehicles, storing equipment). It makes sense that the curtilage shall be limited to the clearing immediately around the inhabited buildings.

**C. Use**

The defendants argue that the entirety of their property is their "yard." From personal experience growing up on a farm, we knew the difference between the fields where we cultivated, tended and harvested crops versus the house and the property where we grew flowers, entertained guests, barbequed, and took care of pets, as compared to our horses, pigs, sheep, and cattle.

Here, the defendants have a trail around their property where they walk for exercise, forage for leafy plants for their salad, and places to sunbathe. The curtilage cannot be extended by their need to hike or sunbathe or gather food. To define such conduct as "activities intimately associated" with the home and thereby expand the definition of curtilage stretches the definition beyond all recognition.

**D. Visibility**

The fourth *Dunn* factor focuses on the steps taken by Kirkwood to prevent observation of the area from passers-by. The residential area is not visible from any public space or from the

coded gate which is locked. He posted "no trespass" signs intermittently. Mr. Kirkwood lives in a forest. To the southwest he has a neighbor whose property is fenced. To the north and northwest he is bounded by a tree farm that has no fences. And on the east he has a neighbor who values his privacy to a similar extent as Mr. Kirkwood, but people can hike in forested areas and come upon the Kirkwood property. The coded gate is an impediment to motor vehicles, but an intrepid person can park their vehicle and walk around the gate and explore the property.

The definition of curtilage is not co-extensive with their subjective expectation of privacy. Calling their entire property as "yard" does not expand the law concerning the curtilage.

The definition of the curtilage in this case extends to the edge of forested areas in close proximity to the home. The agents did not encroach upon the curtilage. They told the Magistrate Judge what they had done and what they observed. The Magistrate Judge decided to issue the search warrant. He too, did not conclude that the agents had invaded the curtilage or conducted an unlawful search.

The Motion to Suppress Evidence [Dkt. #99] is **DENIED**.

**IT IS SO ORDERED.**

DATED this 9th day of May, 2012

Ronald B. Leighton
United States District Judge